UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - -:
RENEE KILLINGS,                     :   15 Civ. 8092 (AT) (JCF)
                                    :
                Plaintiff,          :        REPORT AND
                                    :   RECOMMENDATION
    - against -                     :
                                    :   ┌─────────────────────────────┐
COMMISSIONER OF SOCIAL SECURITY,    :   │ USDS SDNY                   │
                                    :   │ DOCUMENT                    │
                Defendant.          :   │ ELECTRONICALLY FILED        │
- - - - - - - - - - - - - - - - - -:   │ DOC #:_____                │
TO THE HONORABLE ANALISA TORRES, U.S.D.J.:│ DATE FILED: 9/16/16      │
                                        └─────────────────────────────┘

        The plaintiff, Renee Killings, brings this action pursuant to

section 205(g) of the Social Security Act (the "Act"), 42 U.S.C. §

405(g), seeking review of a determination of the Commissioner of

Social Security (the "Commissioner") finding that she is not

entitled to disability insurance benefits.  The Commissioner has

filed a motion for judgment on the pleadings pursuant to Rule 12(c)

of the Federal Rules of Civil Procedure, which the plaintiff did

not oppose.  Because the Commissioner's decision is supported by

substantial evidence, I recommend that the motion be granted.

Background

    A. Personal History

    Ms. Killings is forty-six years old and alleges disability

since January 31, 2012 because of symptoms resulting from

degenerative disc disease of the cervical and lumbar spine,[1]

_____

    [1] With age, intevertebral disks begin to wear away and shrink.
In some cases, they may collapse completely and cause the facet

neuralgia[2], carpal tunnel syndrome[3], right hip trochanteric bursitis[4], and rotator cuff[5] syndrome. (R. at 118).[6]

Ms. Killings is a high school graduate. (R. at 143). Among other jobs, she worked as an office assistant for six months ending in March 1999, as an office clerk for four months in 2000, and as

_____

joints in the vertebrae to rub against one another. Pain and stiffness result. Academy of Orthopedic Surgeons, OrthoInfo: Low Back Pain, http://orthoinfo.aaos.org/topic.cfm?topic=A00311 (last updated December 2013).

[2] Neuralgia is an acute paroxysmal pain radiating along the course of one or more nerves usually without demonstrable changes in the nerve structure. MedicinePlus, Neuralgia, http://c.merriam-webster.com/medlineplus/neuralgia (last updated 2016).

[3] Carpal tunnel syndrome is a common condition that causes pain, numbness, and tingling in the hand and arm. The condition occurs when one of the major nerves to the hand — the median nerve — is squeezed or compressed as it travels through the wrist. Academy of Orthopedic Surgeons, OrthoInfo: Carpal Tunnel Syndrome, http://orthoinfo.aaos.org/topic.cfm?topic=A00005 (last updated July 2016).

[4] Trochanteric bursitis is an inflammation of the bursa, a small, jelly-like sac, which covers the bony point of the hip bone called the greater trochanter. Academy of Orthopedic Surgeons, OrthoInfo: Hip Bursitis, http://orthoinfo.aaos.org/topic.cfm?topic=A00409 (last updated March 2014).

[5] Rotator cuff pain commonly causes local swelling and tenderness in the front of the shoulder. Academy of Orthopedic Surgeons, OrthoInfo: Shoulder Impingment/Rotator Cuff Tendinitis, http://orthoinfo.aaos.org/topic.cfm?topic=A00032 (last updated February 2011).

[6] "R." refers to the administrative record filed with the Commissioner's answer.

a marketing representative from 2001 to 2007 and from 2008 to 2012. (R. at 236). The office assistant job required walking or standing for six hours per day and lifting up to fifty pounds (R. at 243), and the office clerk job required walking for six hours per day and lifting up to twenty pounds. (R. at 240-41). As a marketing representative, she set up tables at different locations and distributed and collected applications for health services. (R. at 237, 239). In these positions, the plaintiff would walk or stand for up to six hours per day and carry up to thirty-five pounds. (R. at 238, 240). Ms. Killings' last date of employment was January 2012. (R. at 36). She asserts that at that time she could no longer continue working because her pain had become unbearable. (R. at 38). She is now living with her three children. (R. at 52).

Ms. Killings alleges that she suffers from both physical and psychiatric impairments, the combination of which forms the basis of her claim that she is disabled. (R. at 118). She experiences severe back pain that radiates down her legs bilaterally and severe shoulder, arm, and hand pain on the right side, as a result of which she has limited movement and difficulty performing gross and fine movements. (R. at 118).

B. Medical History

    1. Physical Evidence

        i. St. Luke's Roosevelt Hospital

Ms. Killings sought treatment at St. Luke's Roosevelt Hospital Emergency Department several times during the period at issue.  On November 7, 2012, she visited the hospital complaining of hip, neck, shoulder, and arm pain, and sought a refill of pain medication.  (R. at 215).  She was given prescriptions for Lyrica, a neuropathic pain reliever; a muscle relaxant; acetaminophen; and ibuprofen.  (R. at 216).

On January 1, 2013, Ms. Killings visited the hospital complaining of pain and swelling in her right hip, and difficulty walking.  (R. at 197-99).  She was noted to be ambulatory.  (R. at 199).  Lumbar radiculopathy was diagnosed, and she was prescribed Percocet, a narcotic pain reliever.  (R. at 199).

Ms. Killings was next seen on May 3, 2013, complaining of right hip pain.  (R. at 254, 258-62).  The onset was gradual and located in the right thigh and lower back.  (R. at 258).  She reported symptoms of mild to moderate pain, aggravated by certain positions and movements.  (R. at 258).  She was able to ambulate without assistance and was not in acute distress.  (R. at 255).  A straight leg raising test was positive on the right and left.  (R. at 259).  Motor sensation was intact, and she had muscle strength

4

in the legs.  (R. at 260).  There was paravertebral tenderness of the lumbar spine.  (R. at 260).  She had been seen earlier in the day at the pain management clinic, but she had not received prescriptions for Percocet or Valium "so she decided to come to the [emergency room]."  (R. at 258).  Sciatica was diagnosed, and a narcotic analgesic was prescribed.  (R. at 260-61).

On May 6, 2014, Ms. Killings was seen at the emergency department complaining of right arm pain.  (R. at 313-19, 375-82).  She reported a history of a rotator cuff injury and stated that she was out of pain medication.  (R. at 379).  She was reported to be "[n]egative for back pain."  (R. at 379).  Shoulder strain was diagnosed, along with a suspected rotator cuff injury.  (R. at 314-15).  Acetaminophen was prescribed to relieve pain.  (R. at 316).

## ii. St. Luke's Clinic

Ms. Killings was treated at the St. Luke's outpatient clinic during the period January 2013 through May 2014.  Dr. Vivian Suarez ordered MRIs of her lumbar spine and cervical spine in January 2013.  (R. at 201-03).  Stable degenerative disc disease was observed at L3-L4 with associated minimal spinal canal and foraminal narrowing. (R. at 201).  The remaining lumbar levels were unremarkable.  (R. at 201).  There was a posterior endplate spondylitic ridge with near complete effacement of the anterior subarachoid space without cord compression at C4-5 and C5-6. There

was also osseous hypertrophy at the uncovertebral joint resulting in right foraminal narrowing at C4-5 and C5-6, and a small left paracentral disc protrusion at C6-7. (R. at 202-03). A small right paracentral disc protrusion at C3-4, previously shown in a March 2012 MRI scan, was no longer present. (R. at 202-03).

Ms. Killings saw Dr. Suarez on February 1, 2013. (R. at 284). The plaintiff's muscle tone and bulk were normal, although her gait was described as cautious and antalgic. (R. at 284). Dr. Suarez assessed lumbago, carpal tunnel syndrome, pain in soft tissues of limb, intervertebral cervical disc disorder with myelopathy, chronic migraine without aura, and obesity. (R. at 284). Dr. Suarez also recommended that Ms. Killings defer deciding whether to return to work for three months, since she had just started treatments. (R. at 284).

Ms. Killings saw Dr. Jung Kim on February 20, 2013, for pain management. (R. at 281-82). The plaintiff displayed joint tenderness and decreased range of motion in the neck, with pain upon palpation to the cervical and thoracic spine and paraspinal muscles. (R. at 281). She had an antalgic gait, normal sensation, and slightly diminished motor strength in the right leg. (R. at 281). There were multiple trigger points in her back, as well as tenderness. (R. at 281).

Ms. Killings saw Dr. Carl Braun on May 3, 2013.  (R. at 272-73).  She reported "total body pain," which limited Dr. Braun's examination.  (R. at 272).  The doctor noted that Ms. Killings' complaints of pain in the right L5 distribution were atypical because the pain "does not extend into foot."  (R. at 272).  Dr. Braun refilled her prescriptions for Cymbalta, used to treat depression and anxiety, and Methocarbamol, a muscle relaxer, and referred the plaintiff to physical therapy.  (R. at 272-73).  With respect to her request for Valium, Dr. Braun stated that he "[t]old [her] I will not write [a] new prescription for Valium."  (R. at 273).

Ms. Killings saw Dr. Kim on June 26, 2013, reporting that she had constant back pain and needed a cane to walk.  (R. at 247-48).  The plaintiff stated that she was "unable to get any more percocet . . . ."  (R. at 247).  On examination, the plaintiff had decreased range of motion in her neck and pain on palpation along the cervical and thoracic spine and paraspinal muscles.  (R. at 247).  She had an antalgic gait, normal sensation, and diminished motor activity in her right leg.  (R. at 247).  Dr. Kim reported her to be in "mild acute" distress.  (R. at 247).

Ms. Killings visited Dr. Suarez on July 12, 2013.  (R. at 263).  The plaitiff reported improved sciatic pain after receiving a lumbar steroid injection, with improved gait and pain control.

7

(R. at 263).   She complained of right-sided parasthesias in the hand and forearm despite use of a splint.   (R. at 263).   On examination, sensation was intact, gait was antalgic, and she walked with a cane.   (R. at 263).   Dr. Suarez assessed lumbago, degeneration of cervical intervertebral disc, carpal tunnel syndrome, pain in soft tissues of limb, degeneration of lumbar or lumbosacral intervertebral disc, intervertebral cervical disc disorder with myelopathy, chronic migraine, and obesity.   (R. at 263).

Ms. Killings saw Dr. Suarez again on November 22, 2013.   (R. at 373-74).   The plaintiff had last received an injection in July and stated that her lumbar back pain was returning.   (R. at 373).   Ms. Killings was assessed as having lumbago, degeneration of cervical intervertebral disc, carpal tunnel syndrome, pain in soft tissues of limb, degeneration of lumbar or lumbosacral intervertebral disc, intervertebral cervical disc disorder with myclopathy, cervical region, chronic migraine without aura, without mention of migraines lasting longer than seventy-two hours, and obesity.   (R. at 373).   She was given a prescription for Gabapentin, used to treat postherpetic neuralgia.   (R. at 373).

Ms. Killings had electromyography ("EMG") testing at Dr. Suarez's direction on February 5, 2014.   (R. at 320-24).   Results

suggested borderline median mononeuropathy in the left wrist and very mild median mononeuropathy in the right wrist. (R. at 320).

Ms. Killings treated with Dr. Kim on February 19, 2014. (R. at 290-91, 368-69). On examination, the plaintiff was in mild acute distress, with decreased range of motion in the neck, an antalgic gait, and multiple trigger points and tenderness in her back. (R. at 290). On March 19, 2014, Ms. Killings reported to Dr. Kim that her low back pain and radicular pain had improved following steroid injections, but her upper back pain, while a "little better," was still present. (R. at 306-07, 362-63). On examination, there was decreased range of motion in the neck with pain on palpation, and multiple trigger points and tenderness in the back. (R. at 306). Dr. Kim also reported an antalgic gait. (R. at 306).

Ms. Killings saw Dr. Zachary Weidner on April 1, 2014, for her right shoulder pain. (R. at 311-12, 358-59). On examination, she had full range of motion, but with pain. (R. at 311). Dr. Weidner assessed rotator cuff sprain and strain. (R. at 311).

Ms. Killings visited Dr. Kim again on April 17, 2014. (R. at 329-30). The plaintiff stated that her pain was worse with prolonged walking and standing, but was relieved by injections and rest. (R. at 329). She had cervical paraspinal muscle tenderness, but bilateral motor strength. (R. at 329). Dr. Kim also noted

9

tenderness to palpation in the paralumber area and on the bilateral trapezius trigger point. (R. at 329). Generalized axial back pain in a setting of myofascial pain syndrome and degenerative arthritis were assessed. (R. at 329). The doctor performed a trigger point injection in the cervical and thoracic paraspinal muscles. (R. at 329). Ms. Killings tolerated the procedure without complications and reported more than fifty percent relief. (R. at 329).

On May 12, 2014, Ms. Killings was seen by a physician's assistant for rotator cuff sprain and strain. (R. at 351-52).

### iii. Physical Therapy

On January 28, 2013, Ms. Killings was evaluated at Theradynamics Physical Rehab by a physical therapist and received physical therapy. (R. at 173-78). On evaluation, she could walk over even and uneven terrain with a cane, with difficulty. (R. at 173-74). She climbed stairs using a handrail, with difficulty. (R. at 174). Range of motion was limited in the cervical and lumbar spine. (R. at 175). She had difficulty with pulling, pushing, overhead activities, prolonged walking, stairs, and lying down for a prolonged time. (R. at 173). The therapist noted that Ms. Killings has cervical pain during performance of activities of daily living and overhead activities affecting function; cervical paraspinal muscle weakness secondary to pain; cervical joint limitation of motion secondary to pain and mild inflammation;

impaired posture; cervical paraspinal muscle spasm; trapezius muscle spasm; tingling down the right upper extremity. (R. at 175). Ms. Killings had low back pain during trunk activities, ambulation, and other daily living activities affecting performance and function; limitation of motion of the lumbar spine secondary to pain; lumbar spine muscle weakness secondary to pain; joint restriction secondary to inflammation, lumbar paraspinal muscle spasm; and tingling over the right lower extremity. (R. at 175).

Ms. Killings attended six physical therapy sessions at St. Luke's clinic in February and March 2014. (R. at 340-46). Physical therapy notes indicated a limited range of motion in both shoulders, but normal ranges of motion in both hands, with impaired sensation. (R. at 340-46).

### iv. Benjamin Kropsky, M.D.

On February 12, 2013, Dr. Benjamin Kropsky, an internist, conducted a consultative examination of Ms. Killings. (R. at 191-95). Ms. Killings reported limits in her daily activities, but also reported socializing with friends. (R. at 192). On examination, she was not in acute distress. (R. at 192). Her gait was slow and somewhat unsteady, with a mild to moderate limp favoring the right leg. (R. at 192). She could not walk on her toes or heels, she could squat to a minimal degree, and she stood holding a cane. (R. at 192). Range of motion was limited in the

11

cervical and lumbar spine. (R. at 193). Her physical exam was notable for positive straight leg raises, limited range of motion of the right shoulder and wrists bilaterally, and diminished strength in the right upper and lower extremities and the left upper extremity. (R. at 193-94). Range of motion in the shoulders was partly limited with pain in the lower back, but she had full internal and external rotation in both shoulders. (R. at 193). Ms. Killings had full range of motion in the ankles, and her joints were stable and non-tender. (R. at 194). Deep tendon reflexes were physiologic and equal in upper and lower extremities. (R. at 194). Right and left arm strength was rated as 4/5, right leg strength was rated as 4/5, and left leg strength was rated as 5/5. (R. at 194). Hand and finger dexterity were intact and the plaintiff had full grip strength in both hands. (R. at 194).

Dr. Kropsky diagnosed cervical radiculopathy with cervical disc disease; lumbar radiculopathy with lumbar disc disease; left hip trochanteric bursitis; right shoulder rotator cuff syndrome; and bilateral carpal tunnel syndrome. (R. at 194). The doctor assessed that Ms. Killings had a moderate to severe limitation for lifting and carrying, a moderate limitation for walking, which required her to use a cane, a moderate to severe limitation for climbing stairs; and a severe limitation for squatting and kneeling. (R. at 194). The plaintiff also required help with

activities of daily living such as showering, dressing, and performing household chores. (R. at 194-95).

v. Other Physicians

Ms. Killings saw Dr. Steven Halle on March 1, 2013, reporting that she had not achieved pain relief with physical therapy or medication. (R. at 245). The plaintiff reported ongoing severe lower back pain with lower extremity radiculopathy. (R. at 245). The doctor noted a gait abnormality and performed a trigger point injection and epidural steroid injection to the paralumbar area. (R. at 245-46). Dr. Halle noted that Ms. Killings was discharged in good and stable condition. (R. at 246).

Ms. Killings saw Dr. Jessica Petilla at the St. Luke's Medical Group University Medical Practice Associates on June 17, 2013 for lower back pain. (R. at 269). The plaintiff stated that she had run out of Tramadol and Naproxen, which she had received in the emergency room, and that these medications had improved her sciatic pain. (R. at 269). Dr. Petilla assessed lumbago and sciatica, and refilled her prescriptions. (R. at 270-71).

Dr. Halle again performed a trigger point injection and epidural steroid injection in the lumbar area on July 10, 2013. (R. at 249-50). Ms. Killings complained of cramping and burning pain in her back that extended to her anterior thighs bilaterally. (R. at 249). She also complained of point tenderness of her

13

thoracic region when she lay on her back.  (R. at 249).  Her physical exam revealed bilateral weakness, an antalgic gait, and use of a cane.  (R. at 263).  She reported that the injections reduced her pain by over fifty percent.  (R. at 250).  She was discharged in stable condition.  (R. at 250).

Ms. Killings saw Dr. Migdana Kepecs on February 14, 2014.  (R. at 287-89, 370-72).  The plaintiff reported that the splints she was wearing for carpal tunnel syndrome were helpful.  (R. at 287).  Dr. Kepecs noted that Cymbalta and Methocarbamol had been helpful for Ms. Killings' neck and low back pain.  (R. at 287).  She had undergone EMG and nerve conduction velocity ("NCV") tests of her wrists on February 5, 2014 that showed electrophysiological evidence of borderline median mononeuropathy at the left wrist and mild median mononeuropathy at the right wrist.  (R. at 287).  Dr. Kepecs noted that an MRI of the lumbar spine done in January 2013 showed no large disc herniation or significant spinal canal or foraminal stenosis.  (R. at 287).  An MRI of the cervical spine done in May 2013 indicated mild disc protrusion at C3-4 and development of a mild left paracentral protrusion at C6-7.  (R. at 287).  Physical examination indicated antalgic gait due to pain of the right leg; decreased range of motion of the shoulders bilaterally; good strength of biceps, triceps, wrist extension and flexion bilaterally.  (R. at 288).  Dr. Kepecs assessed

14

cervicalgia, lumbago, and carpal tunnel syndrome.  (R. at 288).
The plaintiff was sent for additional physical therapy, restarted
on Cymbalta, and methocarbomol, and referred to orthopedics.  (R.
at 288).  At a visit with Dr. Kim five days later, the plaintiff
reported that her pain continued in her lower back, radiating into
her right leg with trigger points, tenderness, and an antalgic
gait.  (R. at 290).

Ms. Killings saw Dr. Melissa Larusso on February 24, 2014.
(R. at 292-95, 364-67).   On examination, the plaintiff had
tenderness in the cervical spine, but also had full range of motion
in her neck.  (R. at 295).  She walked with an antalgic gait.  (R.
at 295).  Ms. Killings denied joint pain in her hands, elbows,
knees, and feet, and also denied experiencing shortness of breath.
(R. at 295).

Dr. Yoni Dokko examined Ms. Killings on March 21, 2014.  (R.
at 308-10, 359-61).   Dr. Dokko noted that previous tests and
imaging of her spine showed "minor abnormalities that do not
correlate well with [the] degree of pain."  (R. at 308).  Dr. Dokko
also noted that the plaintiff had been seen by a rheumatologist who
did not find any rheumatologic abnormalities.  (R. at 308).  Ms.
Killings had denied hand pain at a visit with a rheumatologist.
(R. at 308).  The plaintiff reported that her pain was under better
control with Cymbalta.  (R. at 308).  Dr. Dokko prepared a letter

15

addressed "To Whom it may concern," stating that Ms. Killings was unable to work due to severe pain caused by herniated discs, a degenerated disc, cervical myelopathy, cervical spinal disease, and carpal tunnel syndrome.  (R. at 385-86).

Ms. Killings saw Dr. Petilla on May 7, 2014, at which time she complained of right shoulder pain.  (R. at 353-55).  She stated that she had been given a prescription for Vicodin (a narcotic analgesic) the day before at the emergency room but was "having problems getting [the prescription] filled."  (R. at 353).  Peripheral pulses were normal and the extremities showed no edema.  (R. at 354).  The doctor assessed lumbago, carpal tunnel syndrome, obesity, cervicalgia, and degeneration of lumbar or lumbosacral intervertebral disc.  (R. at 354).  Tramadol, Naproxen, and Methocarbamol, Acetaminophen, and Cymbalta were prescribed, but not Vicodin.  (R. at 354-55).

vi. <u>Paul Hobeika, M.D.</u>

On June 13, 2014, Dr. Paul Hobeika performed arthroscopic surgery on Ms. Killing's right shoulder for a subacromial impingement.  (R. at 337-38, 347-50, 383-84).  The plaintiff was released from the hospital the same day.  (R. at 383-84).

16

2. <u>Psychological Evidence</u>

i. <u>Dr. Cecile Martineau</u>

Ms. Killings saw Dr. Cecile Martineau on January 9 and 30, 2013, for a psychiatric evaluation. (R. at 204-12). On examination, the plaintiff was well groomed, walked without a cane, and was able to sit down. (R. at 212). Her thought processes were organized, and her thought content was goal-oriented. (R. at 212). Her affect was full, and her insight and judgment were good. (R. at 212). She also denied suicidal or homicidal ideation and hallucinations. (R. at 212). Dr. Martineau described her mood on January 30th as improved from her visit on January 9th. (R. at 212). The diagnosis was depressive disorder, not otherwise specified. (R. at 212). The doctor stated that the plaintiff's condition was expected to last four months. (R. at 205). Ms. Killings managed all of her activities of daily living, though she was reportedly slowed by joint and back pain. (R. at 208). Ms. Killings had no limitations in understanding, memory, concentration, persistence, social interaction, or adaptation. (R. at 209). Dr. Martineau indicated that she "cannot provide a medical opinion regarding this individual's ability to do work-related activities." (R. at 210). Dr. Martineau noted that the plaintiff was on disability and presented with symptoms of depression, including insomnia, sadness, crying, poor

17

concentration, and forgetfulness, which started in relation to medical issues, specifically arthritic pain, but worsened with the suicide of a close friend in October 2012. (R. at 212).

ii. <u>Dr. Haruyo Fujiwaki</u>

On February 12, 2013, Dr. Haruyo Fujiwaki, a psychologist, conducted a consultative psychiatric evaluation. (R. at 187-90). Ms. Killings reported difficulty falling and staying asleep, feelings of depression and anxiety that she attributed to her loss of function and pain, loss of energy, crying spells, and loss of interest. (R. at 187). She denied manic and psychotic symptoms. (R. at 188). She reported that she sometimes drove and sometimes socialized with friends. (R. at 189). She also stated that her family relationships were good. (R. at 189). Ms. Killings was cooperative, and her manner of relating, social skills, and overall presentation were adequate. (R. at 188). Her speech and language were normal; her thought processes were coherent and goal directed; her affect was appropriate; her mood was dysthymic; and she was oriented to person, place, and time. (R. at 188). Her attention and concentration, and recent and remote memory skills, were intact. (R. at 188). Cognitive functioning was average, and her insight and judgment were fair. (R. at 189). Dr. Fujiwaki diagnosed depressive disorder and anxiety disorder. (R. at 189). He concluded that the plaintiff could: (1) follow and understand

18

simple directions and instructions, (2) perform simple tasks independently, (3) maintain attention and concentration, to a certain extent, (4) maintain a regular schedule, (5) learn new tasks, (6) perform certain complex tasks independently, (7) make appropriate decisions, (8) relate with others, and (9) deal with stress to a certain extent. (R. at 189).

C. <u>Procedural History</u>

On December 17, 2012, Ms. Killings filed an application for disability insurance benefits, alleging disability beginning January 31, 2012. (R. at 59). After her application was initially denied on March 7, 2013 (R. at 68), she requested review by an Administrative Law Judge ("ALJ"), and a hearing was held on June 10, 2014, before ALJ Mark Hecht. (R. at 30-58). Ms. Killings was represented at the hearing by an attorney. (R. at 124).

At the hearing, Ms. Killings testified that she was unable to work due to right shoulder pain, back pain, hip pain, and carpal tunnel syndrome. (R. at 35-40, 44). She stopped working voluntarily because of the pain (R. at 38) and received disability payment through her job from May through July of 2014. (R. at 39). She testified that could not return to her prior work and was unable to engage in other sedentary jobs as well because she could not sit or stand for prolonged periods. (R. at 46). She also

alleged trouble reaching forward and reaching overhead with her right arm.  (R. at 51, 57).

Ms. Killings reported that she was scheduled to undergo arthroscopic surgery for her right shoulder within a week after the hearing.  (R. at 52).  She reported that she received treatment for her conditions, specifically physical therapy, steroid injections every three to four months, and pain medication.  (R. at 40-43, 54).  She stated that the injections "calmed down the pain but the pain [was] still [t]here."  (R. at 42).  She also testified that braces helped alleviate the pain in her wrists.  (R. at 48).

In discussing her daily activities, Ms. Killings testified that during the day she would alternately sit, stand, lie down, and walk.  (R. at 43).  She stated that she took pain medication every day, and experienced side effects including poor appetite, nausea, and "little headaches every now and then."  (R. at 43).  The plaintiff also stated that she took a three to four hour nap during the day, because her medication caused drowsiness.  (R. at 49).

Ms. Killings testified that she lived with her three children, ages twenty-two, fifteen, and six.  (R. at 52).  She stated that she took her youngest child to school (R. at 44, 52-53), and did some household chores, such as washing dishes.  (R. at 43, 49-50).  She testified that she sometimes used a cane (R. at 46-47), "but [] only . . . if  I  go  a  long distance walking or if I go up steps

20

. . . ." (R. at 48). She also alleged difficulty focusing and concentrating due to depression over her physical limitations. (R. at 53).

On July 15, 2014, ALJ Mark Hecht issued a decision finding that Ms. Killings was not disabled within the meaning of the Act during the relevant period. (R. at 13-26). By letter dated July 25, 2015, Ms. Killings requested review of the ALJ's decision. (R. at 12). On September 10, 2015, the Appeals Council denied her request for review, thus rendering the ALJ's decision the final determination of the Commissioner. (R. at 1-4). The plaintiff then commenced this action.

Analytical Framework

    A. Determination of Disability

A plaintiff is disabled under the Social Security Act and therefore entitled to benefits if she can demonstrate, through medical evidence, that she is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than [twelve] months." 42 U.S.C. § 423(d)(1)(A); see also Arzu v. Colvin, No. 14 Civ. 2260, 2015 WL 1475136, at *7 (S.D.N.Y. April 1, 2015). The disability must be of "such severity that [the plaintiff] is not only unable to do his previous work but

cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A).

To determine whether a plaintiff is entitled to disability benefits, the Commissioner employs a five-step sequential analysis. 20 C.F.R. § 404.1520(a)(4); Berry v. Schweiker, 675 F.2d 464, 467 (2d Cir. 1982). First, the plaintiff must demonstrate that she is not currently engaging in substantial gainful activity. 20 C.F.R. § 404.1520(a)(4)(i), (b). Second, the plaintiff must prove that she has a severe impairment that "significantly limits [her] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(a)(4)(ii), (c).[9] Third, if the impairment is included in "the Listings" -- 20 C.F.R. Part 404, Subpart P, Appendix 1 -- or is the substantial equivalent of a listed impairment, the plaintiff is automatically considered disabled. 20 C.F.R. § 404.1520(a)(4)(iii), (d). Fourth, if the plaintiff is unable to

---

[9] Basic work activities are those "abilities and aptitudes necessary to do most jobs." 20 C.F.R. § 404.1521(b). The failure to address a condition at step two will constitute harmless error, and therefore not warrant remand, if, after identifying other severe impairments, ALJ considers the excluded conditions or symptoms in the subsequent steps and determines that they do not significantly limit the plaintiff's ability to perform basic work. Reices-Colon v. Astrue, 523 F. App'x 796, 798 (2d Cir. 2013) ("Because [the excluded conditions] were considered during the subsequent steps, any error was harmless."); see also Zabala v. Astrue, 595 F.3d 402, 409-10 (2d Cir. 2010)(where medical report presented no reasonable likelihood of changing ALJ's disability determination, exclusion of report does not require remand).

make the requisite showing under step three, she must prove that
she does not have the residual functional capacity ("RFC") to
perform her past work.   20 C.F.R. § 404.1520(a)(4)(iv), (e).
Fifth, if the plaintiff satisfies her burden of proof on the first
four steps, the burden shifts to the Commissioner to demonstrate
that there is alternative substantial gainful employment in the
national economy that the plaintiff can perform.   20 C.F.R. §§
404.1520(a)(4)(v), (g), 404.1560(c); Longbardi v. Astrue, No. 07
Civ. 5952, 2009 WL 50140, at *23 (S.D.N.Y. Jan. 7, 2009) (citing
Rosa v. Callahan, 168 F.3d 72, 77 (2d Cir. 1999), and Bapp v.
Bowen, 802 F.2d 601, 604 (2d Cir. 1986)).   In conducting the five-
step sequential analysis, the Commissioner must consider objective
medical facts, diagnoses or medical opinions based on these facts,
subjective evidence of pain or disability, and the plaintiff's
educational background, age, and work experience.   Brown v. Apfel,
174 F.3d 59, 62 (2d Cir. 1999) (quoting Mongeur v. Heckler, 722
F.2d 1033, 1037 (2d Cir. 1983)).

    B. Judicial Review

Under Rule 12(c) of the Federal Rules of Civil Procedure, a party
is entitled to judgment on the pleadings if she establishes that no
material facts are in dispute and that she is entitled to judgment
as a matter of law.   Burnette v. Carothers, 192 F.3d 52, 56 (2d

Cir. 1999); <u>Morcelo v. Barnhart</u>, No. 01 Civ. 743, 2003 WL 470541, at *4 (S.D.N.Y. Jan. 21, 2003).

The Social Security Act provides that the Commissioner's findings "as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). It allows a plaintiff to obtain judicial review of the Commissioner's final determination denying an application for disability insurance benefits. <u>Id.</u> A court reviewing the Commissioner's decision "may set aside a decision of the Commissioner if it is based on legal error or if it is not supported by substantial evidence." <u>Geertgens v. Colvin</u>, No. 13 Civ. 5133, 2014 WL 4809944, at *1 (S.D.N.Y. Sept. 24, 2014) (quoting <u>Hahn v. Astrue</u>, No. 08 Civ. 4261, 2009 WL 1490775, at *6 (S.D.N.Y. May 27, 2009)); <u>see also</u> <u>Longbardi</u>, 2009 WL 50140, at *21.

Judicial review, therefore, involves two levels of inquiry. First, the court must decide whether the Commissioner applied the correct legal standard. <u>Tejada v. Apfel</u>, 167 F.3d 770, 773 (2d Cir. 1999); <u>Calvello v. Barnhart</u>, No. 05 Civ. 4254, 2008 WL 4452359, at *8 (S.D.N.Y. April 29, 2008). Second, the court must decide whether the ALJ's decision was supported by substantial evidence. <u>Tejada</u>, 167 F.3d at 773; <u>Calvello</u>, 2008 WL 4452359, at *8. "In determining whether substantial evidence exists, a reviewing court must consider the whole record, examining the

evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight." Longbardi, 20162009 WL 50140, at *21 (citing Brown, 174 F.3d at 62, and Williams v. Bowen, 859 F.2d 255, 258 (2d Cir. 1988)). Substantial evidence in this context is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Hahn, 2009 WL 1490775, at *6 (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971)).

C. The ALJ's Decision

ALJ Mark Hecht evaluated the plaintiff's claim pursuant to the five-step sequential evaluation process and concluded that the plaintiff was not disabled within the meaning of the Act between January 31, 2012 and July 15, 2014, the date of the ALJ's decision. (R. at 16-26); 20 C.F.R. §§ 404.1520, 416.920. At step one, the ALJ found that Ms. Killings has not engaged in substantial gainful activity since January 31, 2012, the alleged onset date. (R. at 18). At step two, he found that Ms. Killings has the "severe" impairments of cervical radiculopathy, right shoulder cuff injury, bilateral carpal tunnel syndrome, and right hip pain diagnosed as bursitis. (R. at 18). ALJ Hecht acknowledged that Ms. Killings had more than minimal work-related functional limitations due to those impairments, resulting in "severe" impairments, as that term

25

is defined in the Social Security Regulations.  (R. at 18).  The ALJ also determined that the plaintiff did not have a severe mental impairment.  (R. at 18-19).  At step three, he found that Ms. Killings' impairments did not meet or equal the requirements of any listed impairment under 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 19-20).  At step four, ALJ Hecht determined that Ms. Killings had the residual functional capacity to perform the full range of sedentary work as defined in 20 C.F.R. § 404.1567(a). (R. at 20).  In making this finding, he considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence. (R. At 20-21).  The ALJ found that the plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms.  (R. at 23).  However, he concluded that the plaintiff's statements concerning the intensity, persistence, and limiting effects of these symptoms were not entirely credible.  (R. at 23).  At the fifth step of the sequential evaluation, the ALJ determined that Ms. Killings was capable of working as a marketing representative or office clerk as generally performed in the national economy, which are jobs she had previously held.  (R. at 24).  See 20 C.F.R. § 404.1520(e), (f).  ALJ Hecht considered Ms. Killing's age, education, work experience, and residual functional capacity, and relied on Rule 201.28 of the medical-vocational

guidelines to find that Ms. Killings was not disabled.  (R. at 25-26); see 20 C.F.R § 404.1520(g).

D. Duty to Develop the Record

"Because a hearing on disability benefits is a non-adversarial proceeding, the ALJ generally has an affirmative obligation to develop the administrative record." Perez v. Chater, 77 F.3d 41, 47 (2d Cir. 1996).  This obligation requires the ALJ to make "'every reasonable effort' to help an applicant get medical reports from her medical sources" and other evidence to resolve any "inconsistencies, gaps or ambiguities in the record." Villarreal v. Colvin, No. 13 Civ. 6253, 2015 WL 6759503, at *17 (S.D.N.Y. Nov. 5, 2015) (quoting 20 C.F.R. §§ 404.1512(d), 416.912(d)).  The record as a whole must be complete and detailed enough to allow the ALJ to determine the plaintiff's residual functional capacity.  20 C.F.R. § 416.913(e); Social Security Ruling ("SSR") 96-8p, 1996 WL 374184, at *5 (July 2, 1996).

The ALJ need not gather additional information "to fill any gap in the medical evidence," but rather must do so "only where the facts of the particular case suggest that further development is necessary to evaluate the [plaintiff's] condition fairly." Francisco v. Commissioner of Social Security, No. 13 Civ. 1486, 2015 WL 5316353, at *11 (S.D.N.Y. Sept. 11, 2015).  ALJ Hecht described the steps he took when considering each of the

physician's opinions and the medical records and explained how the record supported his conclusion.  Here, there was no apparent gap that required the ALJ to further develop the record.

E. <u>Substantial Evidence</u>

Substantial evidence supported the ALJ's determination that Ms. Killings was not disabled.

1.   <u>Mental Impairments</u>

An impairment is "severe" if it "significantly limits [the applicant's] physical or mental ability to do basic work activities."  20 C.F.R. § 404.1520(c).  "A finding of 'not severe' should be made if the medical evidence establishes only a 'slight abnormality' which would have 'no more than a minimal effect on an individual's ability to work.'"  <u>DiPalma v. Colvin</u>, 951 F. Supp. 2d 555, 570 (S.D.N.Y. 2013) (quoting <u>Rosario v. Apfel</u>, No. 97 CV 5759, 1999 WL 294727, at *5 (E.D.N.Y. March 19, 1999)).

With respect to Ms. Killings' mental impairments, the ALJ correctly noted that there is no evidence of severe depression or treatment that would cause more than minimal limitation in the plaintiff's ability to perform basic mental work activities.  (R. at 18).

In making this finding, the ALJ had considered the four broad functional areas called "paragraph B criteria" set out in the disability regulations for evaluating mental disorders and in

section 12.00C of the Listing of Imapairments.  (R. at 18-19); see
20 C.F.R. Part 404, Subpart P, Appendix 1.  The four functional
areas were: activities of daily living; social functioning;
concentration, persistence, or pace; and episodes of
decompensation.  (R. at 18-19)

    The ALJ relied on the opinion of a consultative psychologist,
Dr. Fujiwaki that the plaintiff could perform all basic work-
related mental activities, such as understanding, carrying out and
remembering simple instructions, making appropriate decisions,
relating with others, maintaining a regular schedule, and learning
new tasks.  (R. at 19, 190-91); see also Swiantek v. Commissioner
of Social Security, 588 F. App'x 82, 83 (2d Cir. 2015) (finding
that ALJ did not err where he relied "on the psychiatric evaluation
of a consultative psychologist who personally examined [the
plaintiff] as well as [the plaintiff's] complete medical history
and treatment notes").  Dr. Fujiwaki also found that her speech and
language skills were adequate.  (R. at 19).  The ALJ referred as
well to Dr. Martineau's finding that the plaintiff had no
limitation in understanding and memory, sustained concentration and
persistence, social interaction, or adaption.  (R. at 19); see 20
C.F.R. § 404.1521 (impairment not severe if it "does not
significantly limit your . . . mental ability to do basic work
activities").  Dr. Martineau had also reported that the plaintiff

managed all activities of daily living though with pain. (R. at 19). Accordingly, the evidence warranted the ALJ's determination that Ms. Killings' mental impairment caused no more than mild limitations in any of the first three functional areas and no episodes of decompensation, and was therefore not severe. (R. at 19); see 20 C.F.R. § 404.1520(a)(4)(iii).

> 2.   <u>Physical Impairments</u>
>
> a.   <u>Listings</u>

The ALJ found that Ms. Killings did not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.   20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526; (R. at 18).

The Second Circuit has held that an ALJ "should set forth a sufficient rationale in support of his decision to find or not find a listed impairment." <u>Salmini v. Commissioner of Social Security</u>, 371 F. App'x 109, 112 (2d Cir. 2010) (quoting <u>Berry</u>, 675 F.2d at 469). However, "the absence of an express rationale does not prevent [a court] from upholding the ALJ's determination regarding . . . listed impairments, [if] portions of the ALJ's decision and the evidence before him indicate that his conclusion was supported by substantial evidence." <u>Berry</u>, 675 F.2d at 468; <u>see also</u> <u>Sava v.</u>

30

<u>Astrue</u>, No. 06 Civ. 3386, 2010 WL 3219311, at *3 (S.D.N.Y. Aug. 12, 2010).

With regard to the plaintiff's spinal impairment, ALJ Hecht considered Listing 1.04, which covers disorders of the spine

> resulting in the compromise of a nerve root (including
> the cauda equina) or the spinal cord, with: (A) Evidence
> of nerve root compression characterized by neuro-anatomic
> distribution of pain, limitation of motion of the spine,
> motor loss (atrophy with associated muscle weakness or
> muscle weakness) accompanied by sensory or reflex loss
> and, if there is involvement of the lower back, positive
> straight-leg raising test (sitting and supine); or (B)
> Spinal arachnoiditis, confirmed by an operative note or
> pathology report of tissue biopsy, or by appropriate
> medically acceptable imaging, manifested by severe
> burning or painful dysesthesia, resulting in the need for
> changes in position or posture more than once every 2
> hours; or (C) Lumbar spinal stenosis resulting in
> pseudoclaudication, established by finding on appropriate
> medically acceptable imaging, manifested by chronic
> nonradicular pain and weakness, and resulting in
> inability to ambulate effectively . . . .

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.04; <u>see</u> <u>McKinney v.</u> <u>Astrue</u>, No. 5:05-CV-174, 2008 WL 312758, at *4 (N.D.N.Y. Feb. 1, 2008).

ALJ Hecht did not provide an express rationale for his finding that the plaintiff's spinal impairment did not meet Listing 1.04. However, other parts of his opinion and the evidence in the record indicate that this finding was supported by substantial evidence. <u>See</u> <u>Berry</u>, 675 F.2d at 468; <u>Sava</u>, 2010 WL 3219311, at *3.  A January 2013 MRI of the plaintiff's cervical and lumbar spine

showed no large disc herniation, significant spinal canal stenosis, or foraminal stenosis.  (R. at 201-03).  ALJ Hecht emphasized that the MRI displayed "no cord compression."  (R. at 24) (emphasis in original).  A May 2013 MRI of the plaintiff's cervical spine showed the same results, except for resorption of a mild disc protrusion at C3-4 and development of mild left paracentral protrusion at C6-7.  (R. at 287).  The plaintiff consistently reported back pain extending into the neck, arms, and legs (R. at 195, 245, 247, 249, 281, 290), though two physicians noted that the plaintiff's reports of pain were atypical for her impairments (R. at 272, 308).  At various times in 2013 and 2014, the plaintiff displayed normal deep tendon reflexes in her arms and legs (R. at 194), full bilateral motor strength in her legs (R. at 259), and bilateral motor strength "throughout."  (R. at 329).  At its worst, the plaintiff's motor strength was reported as "slightly diminished" or rated at "4/5."  (R. At 193, 247, 281).  Therefore, the ALJ's finding that the plaintiff's spinal impairment did not meet Listing 1.04 is supported by substantial evidence.  (R. at 20)

With respect to the plaintiff's wrist impairment, "carpal tunnel syndrome does not specifically appear in the Listings.   [An applicant's] carpal tunnel syndrome would have to qualify as a 'Major dysfunction of a joint' to qualify as an impairment." Gibbs v. Astrue, No. 07 Civ. 10563, 2008 WL 2627714, at *21 (S.D.N.Y.

32

July 2, 2008) (quoting  20 C.F.R. Pt. 404, Subpt. P, App. 1, §
1.02).  "Major dysfunction of a joint" is

> [c]haracterized by gross anatomical deformity (e.g.,
> subluxation, contracture, bony or fibrous ankylosis,
> instability) and chronic joint pain and stiffness with
> signs of limitation of motion or other abnormal motion of
> the affected joint(s), and findings on appropriate
> medically acceptable imaging of joint space narrowing,
> bony destruction, or ankylosis of the affected joint(s).

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.02.  If the joint at issue
is the wrist, there must also be an "inability to perform fine and
gross movements effectively."  20 C.F.R. Pt. 404, Subpt. P, App. 1,
§ 1.02(B).  The plaintiff's EMG study showed only borderline median
mononeuropathy in the left wrist and very mild median
mononeuropathy in the right wrist.  (R. at 287).  A subsequent
examination revealed good strength in the biceps and triceps, and
good extension and flexion in the wrists.  (R. at 288).  There was
no medical evidence the Ms. Killings had either a "gross anatomical
deformity" or inability to perform fine and gross movements.

As to the plaintiff's shoulder impairment after the surgery,
ALJ Hecht considered Listing 1.08, which requires a soft tissue
injury of an upper or lower extremity, trunk, or face and head,
where there has been surgery directed toward the salvage or
restoration of major function, where the major function was not
restored or is not expected to be restored within 12 months of
onset.  (R. at 20).  Generally, when there has been no surgical or

medical intervention for six months after the last definitive surgical procedure, it can be concluded that maximum therapeutic benefit has been reached.   (R. at 20).   The plaintiff had arthroscopic surgery for her right shoulder in June 2014 (R. at 337-38, 347-50, 383-84), but the impairment did not meet the twelve-month durational requirement for disability because the recovery only lasted for about three months.   See 20 C.F.R § 404.1509.

### b.   Residual Functional Capacity

The ALJ's finding that Ms. Killings had the residual functional capacity to perform the full range of sedentary work as defined in 20 C.F.R. § 404.1567(a) was supported by substantial evidence.   (R. at 14).

When determining a plaintiff's residual functional capacity, the ALJ must consider all relevant evidence regarding the plaintiff's physical and mental abilities, pain, and other limitations in order to determine whether the plaintiff retains the ability to return to past relevant work, or in the alternative, to adjust to other work existing in the national economy.   20 C.F.R. § 404.1545(a).   See also Padula v. Astrue, 514 F. App'x 49, 51 (2d Cir. 2013) (residual functional capacity determination evaluates "all of the [applicant's] symptoms and the extent to which the

claimed symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence").

The ALJ considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence (R. at 20-21) and other evidence, based on the requirements of 20 C.F.R. § 404.1529 and SSRs 96-4p and 96-7p. He also considered opinion evidence in accordance with the requirements of 20 C.F.R. § 404.1527 and SSRs 96-2p, 96-5p, 96-6p and 06-3p. (R. at 20-21).

The ALJ properly gave greater weight to the reports of the doctors than to Ms. Killings' subjective complaints. See Genier v. Astrue, 606 F.3d 46, 49 (2d Cir. 2010) (when determining capacity, ALJ "is not required to accept the plaintiff's subjective complaints without question; he may exercise discretion in weighing the credibility of the plaintiff's testimony in light of the other evidence in the record"); Mojica v. Commissioner of Social Security, No. 13 Civ. 5631, 2014 WL 6480684, at *13 (S.D.N.Y. Nov. 17, 2014) (finding that in determining capacity, ALJ properly evaluated credibility of the plaintiff's symptoms in context of entire record).

The ALJ determined that Ms. Killings had the residual functional capacity to perform "sedentary work." (R. at 20). Sedentary work involves lifting no more than ten pounds at a time

and occasionally lifting or carrying articles like docket files, ledgers, and small tools. 20 C.F.R. § 404.1567(a). Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Id.; (R. at 24).

Examinations of the plaintiff's back revealed normal sensation, muscle tone, and bulk (R. at 247, 284). She also displayed full muscle strength in the legs and intact motor sensation. (R. at 260). Dr. Braun reported in May 2013 that plaintiff's complaints of pain in the right L5 distribution were "atypical" because the pain "does not extend into [the] foot," (R. at 272-73). Dr. Dokko reported that tests and imaging of Plaintiff's spine in 2012 and 2013 showed "minor abnormalities that [did] not correlate well with degree of pain [alleged]." (R. at 308). In March 2014, the plaintiff reported decreased low back pain. (R. at 306). Finally, a May 6, 2014 treatment report from St. Luke's noted that plaintiff did not have any back pain (R. at 379), and an examination on May 7, 2014, revealed normal peripheral pulses and no edema in the extremities. (R. at 354). Given this evidence, the ALJ could reasonably conclude that plaintiff's back impairment permitted the performance of sedentary work.

In assessing plaintiff's residual functional capacity, the ALJ also considered the opinion of a consultative examiner, Dr.

36

Kropsky, that plaintiff had a moderate to severe limitation for lifting and carrying and a moderate limitation for walking, which required using a cane. (R. at 23-24). As the ALJ recognized, Dr. Kropsky's assessment was generally consistent with a conclusion that plaintiff could do sedentary work, with the exception of a requirement that plaintiff use a cane. (R. at 24). Yet the plaintiff reported that she used a cane only "if I go a long distance walking or if I go up steps . . . ." (R. at 48). Thus, the ALJ could reasonably find that even if plaintiff required this limited use of a cane, this would be compatible with plaintiff's ability to do sedentary work. See 20 C.F.R. § 404.1567(a).

The ALJ took into consideration Dr. Dokko's statement that the plaintiff's conditions "make it impossible for her to work" (R. at 385-86). But because this is an opinion on an issue reserved to the Commissioner, the ALJ was not required to give it special weight. 20 C.F.R. § 404.1527(d) ("We will not give any special significance to the source of an opinion on issues reserved to the Commissioner . . ."); see also Matta v. Astrue, 508 F. App'x 53, 56 (2d Cir. 2013) ("Although the ALJ's conclusion may not perfectly correspond with any of the opinions of medical sources cited in his decision, he was entitled to weigh all of the evidence available to make [a residual functional capacity] finding that was consistent with the record as a whole").

Given the evidence discussed above, the ALJ's residual functional capacity determination for sedentary work was supported by substantial evidence.

c. Credibility

The ALJ's decision that Ms. Killings' subjective complaints concerning the intensity, persistence and limiting effects of the symptoms were not entirely credible is entitled to deference.[8] (R. at 23).

In determining whether a plaintiff is disabled, the ALJ must consider subjective evidence of pain or disability as testified to by the plaintiff. 20 C.F.R. § 404.1529(a). However, "[s]tatements about a [plaintiff's] pain cannot alone establish disability; there

---

[8] On March 28, 2016, after the ALJ submitted his opinion in this case, the Social Security Administration issued SSR 16-3p, instructing its adjudicators to stop evaluating the "credibility" of an applicant's statements. Social Security Ruling 16-3p, 81 Fed. Reg. 14166, 14167 (March 28, 2016). Instead, adjudicators should "consider all of the evidence in the record [to] evaluate the intensity and persistence of symptoms . . . ." Id. The policy change is designed to "clarify that subjective symptom evaluation is not an examination of an individual's character." Id. Under the new framework, the agency will continue to "evaluate whether the statements are consistent with objective medical evidence and the other evidence." Id. at 14169.

ALJ Hecht's evaluation of the credibility of the plaintiff's statements does not focus on her character. Rather, it assesses the consistency of her statements with the other medical evidence in the record. Accordingly, the publication of SSR 16-3p after the release of his opinion does not affect the validity of his credibility analysis.

must be medical evidence that shows that the [plaintiff] has a medically determinable impairment that could reasonably be expected to produce the pain or other symptoms alleged." Davis v. Massanari, No. 00 Civ. 4330, 2001 WL 1524495, at *6 (S.D.N.Y. Nov. 29, 2001). If an ALJ "finds that a [plaintiff] is not credible[,] [he] must do so 'explicitly and with sufficient specificity to enable the Court to decide whether there are legitimate reasons for the ALJ's disbelief and whether his determination is supported by substantial evidence.'" Henningsen v. Commissioner of Social Security, 111 F. Supp. 3d 250, 268 (E.D.N.Y. 2015) (quoting Rivera v. Astrue, No. 10 CV 4324, 2012 WL 3614323, at *14 (E.D.N.Y. Aug. 21, 2012)).

Because "symptoms sometimes suggest a greater severity of impairment than can be shown by objective medical evidence alone," where the plaintiff's testimony concerning the intensity, persistence, or functional limitations associated with his impairments is not fully supported by clinical evidence, the regulations require the ALJ to consider additional factors to assess the plaintiff's credibility. 20 C.F.R. § 404.1529(c)(2),(3). These include:

> (1) the [plaintiff's] daily activities; (2) the location, duration, frequency, and intensity of the [symptoms]; (3) precipitating and aggravating factors; (4) the type, dosage, effectiveness, and side effects of any medications taken to alleviate the [symptoms]; (5) any

treatment, other than medication, that the plaintiff has received; (6) any other measures that the plaintiff employs to relieve the [symptoms]; and (7) other factors concerning the plaintiff's functional limitations and restrictions as a result of the [symptoms].

Henningsen, 111 F. Supp. 3d at 268; see also 20 C.F.R. § 404.1529(c)(3)(i)-(vii).

In determining the plaintiff's credibility, the ALJ is not required to "discuss all the factors [] 'as long as the decision includes precise reasoning, is supported by evidence in the case record, and clearly indicates the weight the ALJ gave to the plaintiff's statements and the reasoning for that weight.'" Simmons v. Commissioner of Social Security, 103 F. Supp. 3d 547, 569 (S.D.N.Y. 2015)(quoting Felix v. Astrue, No. 11 CV 3697, 2012 WL 3043203, at *8 (E.D.N.Y. July 24, 2012)). Moreover, "'[b]ecause the ALJ has the benefit of directly observing a plaintiff's demeanor and other indicia of credibility,' his decision to discredit subjective testimony is 'entitled to deference' and may not be disturbed on review if his disability determination is supported by substantial evidence." Felix, 2012 WL 3043203, at *8 (quoting Brown v. Astrue, No. 08 CV 3653, 2010 WL 2606477, at *6 (E.D.N.Y. June 22, 2010)); see Salmini, 371 F. App'x at 113 ("Generally speaking, it is the function of the ALJ, not the reviewing court, 'to resolve evidentiary conflicts and to appraise the credibility of witnesses, including the [plaintiff].'" (quoting

40

Carroll v. Secretary of Health and Human Services, 705 F.2d 638, 642 (2d Cir. 1983)).

The regulations do not allow the ALJ to reject a plaintiff's statements about her symptoms solely because they are not substantiated by objective medical evidence, but the ALJ may consider any conflicts between the plaintiff's testimony and the rest of the evidence.  20 C.F.R. § 404.1529(c)(2), (4); see Puente v. Commissioner of Social Security, 130 F. Supp. 3d 881, 894 (S.D.N.Y. 2015).

Here, the ALJ examined the plaintiff's testimony and her medical records regarding her functional limitations and concluded that the medical evidence did not corroborate her allegations of total disability.  See 20 C.F.R. § 404.1529(c)(3)(i) (in evaluating claims of symptoms, SSA considers the plaintiff's daily activities).  Ms. Killings reported taking her six-year-old daughter to school, driving, and doing some chores, such as washing dishes.  (R. at 43-44, 49-50, 53, 189).  She reported walking for about thirty minutes per day.  (R. at 226).  She also reported to Dr. Kropsky and to Dr. Fujiwaki that she socialized with friends. (R. at 189, 192); see 20 C.F.R. § 404.1529(c)(3)(i)(consider daily activities in evaluating credibility).

The ALJ also considered the relief that Ms. Killings obtained from her symptoms through medication, injections, and other

treatment.   <u>See</u>   20   C.F.R.   §   404.1529(c)(3)(iv)-(v)   (consider effectiveness of medication and other treatment to alleviate pain or other symptoms in evaluating credibility).   As the ALJ noted, treatment records documented that steroid injections provided pain relief and improved the plaintiff's gait.   (R. at 247, 251, 263, 290, 306, 329).   In addition, the plaintiff's pain had diminished with the use of Cymbalta.   (R. at 308).   Ms. Killings denied any hand pain at a visit with a rheumatologist (R. at 308), and she also reported that wrist splints helped her carpal tunnel syndrome. (R. at 287).

Ms. Killings had an extensive work history, and "a [plaintiff] with a good work record is entitled to substantial credibility when claiming an inability to work because of disability."   <u>Rivera v. Schweiker</u>, 717 F.2d 719, 725 (2d Cir. 1983) (citing <u>Singletary v. Secretary of Health, Education and Welfare</u>, 623 F.2d 217, 219 (2d Cir. 1980)).   "Work history, however, is but one of many factors to be utilized by the ALJ in determining credibility."   <u>Marine v. Barnhart</u>, No. 00 Civ. 9392, 2003 WL 22434094, at *4 (S.D.N.Y. Oct. 24, 2003).   That Ms. Killings' "work history was not specifically mentioned in the ALJ's decision does not undermine the credibility assessment, given the substantial evidence supporting the ALJ's determination."   <u>Wavercak v. Astrue</u>, 420 F. App'x 91, 94 (2d Cir. 2011).

The ALJ laid out the apparent inconsistencies between the plaintiff's subjective complaints and the medical evidence. (R. at 23-24). Because this analysis indicated that the residual functional capacity determination was informed by the medical record and the ALJ's assessment of the plaintiff's credibility, the ALJ's credibility assessment was not, in and of itself, legal error. See Briscoe v. Astrue, 892 F. Supp. 2d 567, 585 (S.D.N.Y. 2012).

### 5. Jobs in the National Economy

The ALJ found that Ms. Killings is capable of performing her past work as a marketing representative or office clerk because this work does not require the performance of work-related activities precluded by the plaintiff's residual functional capacity. (R. at 24). Taking into account Ms.Killings' age, education, work experience, and residual functional capacity in conjunction with the Rule 201.28 of the Medical-Vocational Guidelines, 20 C.F.R. §404, subpart P, Appendix 2, the ALJ found that there were jobs in significant numbers in the national economy that she could perform, and she was therefore not disabled. (R. at 24-25). This determination, too, was supported by substantial evidence.

The ALJ properly relied on the Medical-Vocational Guidelines contained in 20 C.F.R. § 404, subpart P, Appendix 2, commonly

referred to as "the Grid." (R. at 25). The Grid takes into account the plaintiff's residual functional capacity in conjunction with age, education, and work experience in order to determine whether the plaintiff can engage in any substantial gainful work which exists in the national economy. (R. at 25). If the plaintiff can perform all or substantially all of the exertional demands at a given level of exertion, the medical-vocational rules direct a conclusion of either "disabled" or "not disabled" depending upon the plaintiff's specific vocational profile (SSR 83-11). (R. at 25). Generally, the result listed in the Grid is dispositive on the issue of disability. Zorrilla v. Chater, 915 F. Supp. 662, 667 (S.D.N.Y. 1996).

The ALJ properly considered Ms. Killings' age. He noted that Ms. Killings was forty-one years old on the alleged disability onset date and fell in the category of "younger individual" through the age of 44. (R. at 25); see 20 C.F.R. § 404.1563; see also 20 C.F.R. Pt. 404, Subpt. P, App. 2(h)(1). The ALJ also considered that Ms. Killings had at least a high school education and was able to communicate in English. (R. at 25); see 20 C.F.R. § 404.1564. There was no substantial evidence that Ms. Killings' residual functional capacity was limited to less than the full range of sedentary work. See 20 C.F.R. Pt. 404, Subpt. P, App. 2(h)(3). Her history of improvement with treatment for each of her

44

impairments indicates that her exertional capacity was not significantly reduced. See, e.g., Martise v. Astrue, 641 F.3d 919, 923-24 (8th Cir. 2011) (responsiveness to medication supported ALJ's finding that they were not severe impairment). Given these circumstances, the ALJ's ultimate finding that Ms. Killings was not disabled should be affirmed.

Conclusion

For the foregoing reasons, I recommend that the Commissioner's motion for judgment on the pleadings (Docket No. 12) be granted. Pursuant to 28 U.S.C. § 636(b)(1) and Rules 72, 6(a), and 6(d) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from this date to file written objections to this Report and Recommendation. Such objections shall be filed with the Clerk of the Court, with extra copies delivered to the chambers of the Honorable Analisa Torres, Room 2210, and to the chambers of the undersigned, Room 1960, 500 Pearl Street, New York, New York 10007. Failure to file timely objections will preclude appellate review.

Respectfully submitted,

JAMES C. FRANCIS IV
UNITED STATES MAGISTRATE JUDGE

Dated: New York, New York
       September 15, 2016

Copies mailed this date to:

Renee Killings
159-70 Harlem River Dr.
#2B
New York, NY 10039

Susan D. Baird, Esq.
Assistant U.S. Attorney
One St. Andrew's Plaza
New York, NY 10007